Delfino R. **OLIVAS,** Plaintiff-Appellee,

**Aetna Life and Casualty Company,** Plaintiff-Intervenor, Appellee,

v.

**UNITED STATES** of America, Defendant-Appellant.

No. 73-1139.

United States Court of Appeals, Ninth Circuit.

Nov. 12, 1974.

---

▆▆▆▆▆▆▆▆▆▆▆▆

———◆———

James D. Whitney, Asst. U. S. Atty. (argued) Tucson, Ariz., for defendant-appellant.

Robert F. Miller (argued), of Miller, Pitt & Feldman, Tucson, Ariz., for plaintiff-appellee.

## OPINION

Before HAMLEY, MERRILL and WRIGHT, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The government has appealed from a judgment under the Federal Tort Claims Act [28 U.S.C. §§ 1346(b), 2671–2680] in favor of the plaintiff-appellee Olivas, because of injuries sustained on a construction project at an Air Force base in Arizona.

It is assigned as error that the district court found that the negligence of a government agent was the proximate cause of Olivas' injury. The government appeals also from the trial court's refusal to allow it to set off amounts paid Olivas by Aetna Life & Casualty Co. (hereinafter "Aetna") under a workmen's compensation policy. The district court also concluded that Aetna had not waived its right under Arizona law to a lien on the proceeds of plaintiff's judgment and this is assigned as error on the government's appeal.

We affirm on the liability issue and reverse on the second and third issues. We conclude that there is a right to the offset and that Aetna, under its agreement with the prime contractor, had waived its right to a lien on the judgment against the government.

### I.

### THE LIABILITY ISSUE

Olivas, a laborer employed by Peter Kiewit Sons' Company (Kiewit), the prime government contractor, was ordered to enter a blast valve for cleaning. While Olivas was inside of the valve, an Air Force officer ordered the valve activated. The officer gave no warning to Olivas or his foreman and failed to comply with required procedures which were intended to protect men within the area. The trial court found that, had he complied with those procedures, authorization would have been denied until it had been determined that the valve could be operated without danger to Kiewit's personnel.

Olivas knew that the valve door would close in 40 seconds, that it could not be stopped, and that he would be crushed to death unless he could be extricated. He was dragged out by the foreman, suffering some minor injury but, the district court concluded:

> As a proximate result of plaintiff's exposure to imminent danger of serious injury within the blast valve, plaintiff sustained an anxiety neurosis, of the traumatic type, with psychoneurotic reactions to stress. The development of such neurosis began immediately after plaintiff's threatened injury and continued until it resulted in plaintiff's becoming completely disabled. Such condition is permanent and plaintiff is, and will be in the future, unable to obtain or perform any gainful employment.

It was also found that the Air Force officer acted within the scope of his employment, that a reasonably prudent person in that situation would not have acted as he did, and that such conduct involved an unreasonable risk of harm to one in Olivas' position. Kiewit's superintendent was found to be concurrently negligent. Both acts were found to be independent causes of the injury and each was a proximate cause of the damage.

The government argues that its negligence was not the proximate cause of the specific injury claimed by the plaintiff, as detailed above.

In areas not covered by statute or prior judicial decision, the Arizona courts look to the Restatement of the

law. Roberson v. United States, 382 F. 2d 714, 718 n.4 (9th Cir. 1967), Serrano v. Ethridge Contracting Co., 2 Ariz.App. 473, 409 P.2d 757, 760 (1966). We look to the Restatement (Second) of Torts (1965).

Appellant urges that subsection 313(1) of the Restatement provides the applicable test for determining liability for the unintentional infliction of emotional distress. It reads:

§ 313. Emotional Distress Unintended

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, . . . and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness of bodily harm.

Appellant asserts, therefore, that according to subsection 313(1)(a), liability for emotional distress can be imposed only if the nature and extent of the distress are reasonably foreseeable. From this premise the government concludes that, given the nature of the "traumatic event" in this case, emotional distress so severe as to result in total disability could as a matter of law not have been foreseeable.

But this is not a simple case of unintended emotional distress. The risk of harm to Olivas was, in the first instance, physical injury. And the trial court specifically found that Olivas' anxiety and resulting disability came about as a proximate result of his exposure to

this imminent danger of serious physical injury.

In such a case, the official comment to subsection 313(1) directs us to Restatement § 436,[1] which governs situations where an act negligent primarily because it threatens bodily harm rather than because of a recognizable tendency to provoke emotional disturbance, nevertheless results in harm solely from emotional distress. Restatement (Second) of Torts § 436(2) (1965) states:

(2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.

The Reporter's Comment on subsection 436(2) is particulary helpful in delineating the standards to be used when determining whether the injury proximately resulted from the negligence of the actor. It makes it clear that it is immaterial whether it is foreseeable that the negligent conduct would so affect the plaintiff's mind or emotions that this emotional disturbance would cause bodily harm. Rather, it concludes that:

It is enough that, in view of the other's actual, as distinguished from his reasonably foreseeable, emotional stability or instability and physical condition, it is not extraordinary that the emotional distress should have brought on the illness. While it is necessary that the negligent conduct be a substantial factor in bringing about the fright and that the fright also be a substantial factor in bringing about the illness, it is not neces-

---

1. Restatement (Second) of Torts § 313 (1965), Comment on Subsection (1), para. b., states:

"b. The rule stated in this Section is unnecessary to make the actor's conduct negligent and, therefore, to subject him to liability if the actor should realize that it involves an ·unreasonable risk of causing bodily harm

in some other manner, such as by immediate impact. As to the effect which is to be given to the fact that the act negligent because otherwise threatening bodily harm results in the harm solely through the effect of the actor's conduct upon the mind or emotions of the other, see § 436."

sary that the fright be a probable result of the negligence nor the illness a probable result of the fright. It is enough that it is a 'natural' result, using that word as denoting that men of ordinary experience and judgment would not regard the result as extraordinary, after expert testimony has given them the medical information necessary to enable them to form an intelligent opinion.

Restatement (Second) of Torts, § 436 (1965), Comment on Subsection (2), para. d.

■ The trial court found that the defendant's negligence created an unreasonable risk of harm to Olivas (foreseeable plaintiff) and exposed him to "imminent danger of serious injury within the blast valve" (foreseeable injury), so it was not required to find also that the emotional distress resulting in complete disability was foreseeable. Rather, the court's findings of fact obviate the need to find that the type of injury actually resulting was foreseeable.

■ Similarly, the Supreme Court of Arizona has found it unnecessary in this situation to show that the extent of liability was foreseeable. In Tucker v. Collar, 79 Ariz. 141, 285 P.2d 178 (1955), it held that one is liable for all the consequences "proximately resulting" from his or her negligent act, "even though the injury be of a form or to an extent not anticipated." *Id.*, 285 P.2d at 182.

The trial court followed the steps in subsection (2), para. d., in finding that the negligent conduct was a substantial factor in bringing about the fright, and that the fright was a substantial factor in producing the illness. It did not expressly find that Olivas' injury was a *natural* result within the meaning of § 436 but stated instead the conclusion

that the injury was a *proximate* result of defendant's negligence. The difference is of little moment.

■■ Appellant does not question the lack of that specific finding but argues only that the nature and extent of the injury were not foreseeable. The lower court's finding of proximate cause would necessarily include one that the injury resulted *naturally*. Extensive testimony, including that of medical experts, supported the conclusion that given "the medical information necessary to enable them to form an intelligent opinion," men of ordinary experience and judgment "would not regard the result as extraordinary."

■ The Arizona court in *Tucker, supra,* used some of the same "proximately resulting" language employed by the district judge here. This would seem to indicate either a refinement of the § 436 language as applied to Arizona or, more likely, a feeling that in this context the terms *proximate* and *natural* are often interchangeable. We affirm the district court's findings and conclusions on this issue.

## II.

## THE GOVERNMENT'S RIGHT TO SETOFF

Did the trial court err in denying the government a setoff in the amount of payments made or to be made by Aetna?

The government-Kiewit contract was on a cost plus fixed fee basis. Kiewit received a fixed fee plus reimbursement for expenses required under its contract. A contract provision, also a requirement under Arizona law,[2] required Kiewit to cover its employees with workmen's compensation insurance which it did through Aetna.[3] The premiums were a

---

2. Ariz.Rev.Stat. § 23–902 (1971).

3. The relevant contract provision states:
"ARTICLE V—INSURANCE.
"a. The Contractor shall procure and thereafter maintain such bonds and insurance in such forms and such amounts and for such periods of time as the Contracting Officer may require in writing and shall be reimbursed for the cost thereof.
"b. In every instance where this contract requires the United States to pay the premium on a bond or insurance policy, the bond or insurance policy shall contain an endorse-

reimbursable item and the United States reimbursed Kiewit for that expense. Kiewit was of course the insured employer and its employees were the beneficiaries.

After his injury, Olivas applied to the Arizona Industrial Commission and was found eligible for medical and disability benefits. The government argued at trial that it should have credit for the payments made by Aetna under the policy. Aetna intervened and claimed a statutory lien on the proceeds of any recovery by Olivas against the government to the extent of its workmen's compensation payments to the time of judgment. In this dispute, Olivas is neutral but does not want to suffer a double deduction. He does not argue that he should be entitled to keep the full judgment and the payments from Aetna.

The trial court awarded Aetna a lien and denied the United States a setoff. We disagree on both counts. Under this form of contract, the government paid the insurance premiums and should get the credit for the payments made under the policy.

■ Under the collateral source rule, when an injured plaintiff has been compensated for his injuries from a source other than the defendant, the latter can-

not benefit from that recovery. Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 535 (9th Cir. 1962); United States v. Price, 288 F.2d 448, 449 (4th Cir. 1961).

■ The rule is followed in Arizona which recognizes payments under workmen's compensation policies as a collateral source in an action by an injured employee against a third-party tort-feasor. State v. Pressley, 74 Ariz. 412, 250 P.2d 992, 997 (1952); Merritt-Chapman and Scott v. Frazier, 289 F.2d 849, 854 (9th Cir. 1961).

■ But the rule is inapplicable when the defendant is the source of compensation to the plaintiff. The reason has been explained thus:

The philosophy underlying the Collateral Source Rule seems to be that either the injured party or the tort feasor is going to receive a windfall, if a part of the pecuniary loss is paid for by an outside source and that it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort feasor. This conclusion seems to be based on substantial justice. This reasoning, however, does not apply in a situation where the collateral source is the defendant himself. Under those

---

ment or other recital excluding by appropriate language any claim on the part of the insurer or obligor to be subrogated, on payment of a loss or otherwise, to any claim against the United States.

"c. The Contractor shall give the Contracting Officer or his representative immediate notice in writing of any suit or action filed against the Contractor the cost and expense of which are reimbursable under the provisions of Clause 4 hereof, and the risk of which is then uninsured or in which the amount claimed exceeds the amount of insurance coverage. The Contractor shall furnish immediately to the Contracting Officer copies of all pertinent papers received by the Contractor. Insofar as the following shall not conflict with any policy or contract of insurance, and upon request of the Contracting Officer, the Contractor shall do any and all things to effect an assignment and subrogation in favor of the Government, of all Contractor's rights and claims except against the Government, arising from or

growing out of such asserted claims, and if required by the Contracting Officer, shall . . . ."

The record of negotiations (memorandum of understanding) provides:

"INSURANCE

The Contractor presented a memorandum prepared by Midwest Agencies, Inc., which outlined the insurance problems associated with this project. The Contractor then proposed to provide insurance upon the basis of "manual" workmen's compensation rates in Arizona (as required by state law), and, also, insurance, upon the basis of a retrospective plan similar to that approved for the Titan I Update project, for workmen's compensation covering the states of Colorado, California, Kansas, and Arkansas, and for general liability and automobile liability in all states. The proposal was accepted in principle, subject to examination and approval by the Contracting Officer of specific policies to be submitted by the Contractor.

circumstances no one gets a windfall and if a recovery were allowed under those circumstances the result would be that the plaintiff would receive a double recovery and that the defendant would be mulcted twice for the same item of damages. Adams v. Turner, 238 F.Supp. 643, 644–645 (D.D.C.1965).

■ The government claims that it comes within the exception, to which Aetna replies that the cost of insurance is added into any bid on a fixed price contract and that the government would be an indirect source of funds under any type of contract. That ignores the terms of this contract. They are clear and unambiguous. Kiewit's profit had already been determined and the risk of increased premiums was on the government.[4] The parties could have, but did not, contract otherwise. We conclude that the collateral source rule does not preclude the United States from obtaining a setoff under these circumstances and one should be allowed to the extent of the medical benefits and disability compensation paid to Olivas under the Aetna policy.

### III.

### WAIVER OF AETNA'S LIEN

Is Aetna entitled to a statutory lien on Olivas' judgment for the amounts that it has paid to him?

4. We are aware that an experienced contractor bidding on a fixed-price government contract might be able to estimate quite accurately the possible increases in insurance premiums during the course of the contract. But the contractor under a cost-plus-fixed fee contract has the advantage of knowing he will be reimbursed, not on the basis of his estimate as reflected in the fixed fee, but rather on the actual cost to him of the premiums. Consequently, even with relatively good estimates, the contractor and the government alike are in significantly different risk-bearing postures under the two types of contract.

5. WAIVER OF SUBROGATION AGAINST THE UNITED STATES
   "The Company waives any rights of subrogation acquired against the United States of

The United States says it is not because of a waiver of subrogation provision in the Aetna-Kiewit policy.[5] Aetna's motion to intervene had been based on its asserted subrogation interest;[6] it now asserts only a statutory lien under Arizona Rev.Stat. § 23–1023 (1971) which reads in pertinent part:

§ 23–1023. Liability of third person to injured employee; election of remedies

A. If an employee entitled to compensation under this chapter is injured or killed by the negligence or wrong of another not in the same employ, such injured employee . . . may pursue his remedy against such other person.

B. If the employee . . . does not pursue his . . . remedy against such other person by instituting an action within one year after the cause of action accrues, the claim against such other person shall be deemed assigned to the insurance carrier, or to the person liable for the payment thereof. . . .

C. If he proceeds against such other person, compensation and medical, surgical and hospital benefits shall be paid as provided in this chapter and the insurance carrier . . . shall have a lien on the amount actually collectible from such other person to the extent of such compensation and medi-

America by reasons of any payment under this policy; except that such waiver shall not extend to losses caused by acts of the United States of America which are not connected with the contracts and subcontracts covered by Section 1 of this endorsement or with the operations of the employer covered by this policy."

6. Aetna's Motion to Intervene as a Plaintiff states:
   "[Aetna] bases its motion to intervene as of right on the grounds that (1) it has an interest in the transaction in that under Arizona law, it has a subrogation interest against the proceeds of any judgment obtained by plaintiff; (2) the assertion of defendant's set-off impairs Aetna's ability to protect its subrogation interest; . . . ."

cal, surgical and hospital benefits paid. . . .

 It is "well settled that the right of subrogation 'may be modified or extinguished by contract.' " Hardware Mut. Ins. Co. v. Dunwoody, 194 F.2d 666, 668 (9th Cir. 1952). Aetna urges, however, that its waiver of subrogation rights against the United States affects only its interest under parts A. and B. of § 23–1023, and does not undermine its statutory lien under part C.

The Arizona courts have refused to draw such a distinction between "lien" and "subrogation" interests.[7] "Lien rights" under Ariz. Rev.Stat. § 23–1023's predecessors have been treated as if they were subrogation rights. State Industrial Commission v. Pressley, 74 Ariz. 412, 250 P.2d 992, 996–997 (1952); Hornback v. Industrial Commission, 106 Ariz. 216, 474 P.2d 807, 810–811 (1970). We cannot conclude that Aetna did not know of this interpretation of a statutory lien when it agreed to the waiver of subrogation clause, as well as when it relied on its right of subrogation as its statutory basis for intervention in this suit.

Moreover, under the same practical reading which the Arizona courts have accorded to prior versions of § 23–1023, it is clear that the lien interest created under paragraph C. is merely an alternative to the assignment of rights under paragraph B. The provisions are designed to insure that an employee will not receive a double recovery and that the insurance carrier will be reimbursed by the third-party tort-feasor for compensation actually paid.

If the contractual waiver of the right of subrogation is interpreted as a general waiver of the right of reimbursement, it would necessarily include a waiver of both the assignment of rights under paragraph B. and the lien interest under paragraph C. If this interpretation is adopted, the statutory objective of pre-cluding double recovery by the employee will still be accomplished. For, in order for the waiver clause to have any effect, another party to whom the waiver has been contractually granted must be in a position to assert a setoff for the amount of the recovery that otherwise would be subject to the lien. Here that party is the United States.

We hold, therefore, that any right to reimbursement Aetna may have had under Ariz.Rev.Stat. § 23–1023 was expressly waived by the terms of its policy.

Affirmed in part, reversed in part, and remanded with instructions to proceed in a manner consistent with this opinion.

---

7. The earlier cases spoke of "assignments of rights to the state," but this is the same concept as that now characterized as a statutory lien.