EXXON CORPORATION, Appellant,

v.

Michael Ken ALVEY and Loffland
Brothers Company, Appellees.

LOFFLAND BROTHERS COMPANY,
Cross-Appellant,

v.

EXXON CORPORATION,
Cross-Appellee.

Michael Ken ALVEY, Cross-Appellant,

v.

EXXON CORPORATION,
Cross-Appellee.

Nos. 7813, 7877 and 7878.

Supreme Court of Alaska.

Oct. 26, 1984.

D.A. Burr, Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for appellant and cross-appellee, Exxon Corp.

Stephen S. DeLisio, Michael C. Geraghty, Schaible, Staley, DeLisio & Cook, Inc., Anchorage, for appellee and cross-appellant, Loffland Bros., Inc.

George W. Korte, Korte, Crain & Heisler, San Francisco, Cal., and Robert L. Griffin, Anchorage, for appellee and cross-appellant, Michael Ken Alvey.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

This is an appeal of a personal injury action brought by Michael Ken Alvey to recover for the serious injuries he received from falling in a "seismic" hole at an oil drilling site on Alaska's North Slope. The site was leased by the defendant, Exxon Corporation (Exxon). Exxon filed a third-party claim against Loffland Brothers Company (Loffland), an independent con-

tractor who provided drilling services to Exxon and who was Alvey's employer. The third-party claim alleged that Alvey's injuries resulted from Loffland's negligence, and that therefore Loffland was obligated to indemnify Exxon under the terms of a contract between the parties. The jury found that the accident resulted solely from the negligence of Exxon and awarded Alvey $7,108,521.31. This award was reduced by the trial court to $5,000,000.00 on remittitur. Exxon appeals alleging various errors at trial and attacking the amount of the recovery. Alvey cross-appeals alleging that remittitur was improper, and Loffland cross-appeals alleging that it had no indemnity obligation to Exxon under the terms of its contract. We affirm.

## THE FACTS AND PROCEEDINGS

In October 1976, Exxon contracted with Loffland for Loffland to provide drilling services on its leases in the Point Thomson area of the North Slope. During the winter of 1977–78, Exxon wished to expand its drilling activity in the Point Thomson area. Loffland, which had been engaged at the Point Thomson No. 1 well, was to center and install a drilling rig at a second site a few miles away known as Point Thomson No. 2. In addition to Loffland, Exxon also hired Alaska General Construction Co. (Alaska General) and Pioneer Oilfield Services, Inc. (Pioneer) to perform services at Point Thomson No. 2.[1]

On January 4, 1977, the day before the rig was moved to Point Thomson No. 2, Howard Dailey, Exxon's drilling superintendent, and Don Trujillo, one of Loffland's supervisors, drove to Point Thomson No. 2. Dailey testified that he and Trujillo measured and staked locations for the rat hole and the seismic hole (also known as the test hole or survey hole).[2] Dailey also claimed

that he told Trujillo that the seismic hole was to be forty inches in diameter. Trujillo denied having helped stake the seismic hole and disclaimed any knowledge of its dimensions.

The same day Alaska General drilled a forty inch diameter seismic hole to a depth of approximately forty feet. A pipe' or casing which protruded above the ground was placed in the hole. Shortly thereafter Exxon ordered the pipe removed and the hole enlarged to forty-three inches in diameter. After the hole was enlarged, Alaska General reinserted the pipe, but Exxon again ordered the pipe removed so it could be replaced by a larger diameter pipe.

William Pinner, an Exxon foreman, sketched a cover for the hole for a Pioneer carpenter, who then constructed five or six such covers. When Alaska General finished its drilling activities, one of these covers was placed over the seismic hole. This cover consisted of a four by four foot sheet of plywood with a post sticking up in the center, and was similar to a cover placed over the conductor hole. Alaska General employees also testified that they left the seismic hole marked with a flashing light. This testimony was not corroborated by other witnesses.

At about 6:00 p.m. on January 5, Alvey arrived at Point Thomson No. 2 with the Loffland crew to begin centering and installing the oil drilling rig. During the process of centering the rig, John Spencer, a Loffland driller, had his crew members remove the conductor hole cover and place it out of the way thirty or forty yards from the covered seismic hole. Later that evening, Spencer ordered the plaintiff and another crewman to retrieve the conductor hole cover. Alvey, who had been eating when the conductor hole cover was removed, mistook the seismic hole cover for

---

1. See generally Alvey v. Pioneer Oilfield Services, Inc., 648 P.2d 599 (Alaska 1982).

2. The conductor hole, which is the start of the main drilling hole, and the rat hole are both positioned directly beneath the drilling rig. The drilling apparatus, or "kelly" is placed into the rat hole when not in use to keep it out of the

way. The seismic hole, used for seismic testing, is positioned approximately 100 feet from the conductor hole and fifteen feet beyond the edge of the drilling pad. These holes are drilled with a smaller "auger" prior to the positioning of the oil drilling rig.

the conductor hole cover.[3] Alvey picked up the seismic hole cover, pivoted to return to the rig, and fell in the seismic hole. He sustained injuries resulting in substantial paralysis of his legs, failure of bowel, bladder, and sexual functions, and susceptibility to life threatening infection.

Alvey brought suit in August, 1978, against Exxon, Pioneer, and Alaska General for compensatory damages.[4] Exxon filed a third-party claim against Loffland, seeking a determination that Loffland was contractually required to indemnify Exxon for any damages assessed against Exxon. The court subsequently determined that, as a matter of law, Loffland was contractually obligated to indemnify Exxon to the extent that Alvey's damages were due to Loffland's negligence.

After trial, the jury awarded Alvey damages totaling $7,108,521.31, finding Exxon to be solely responsible for the accident. Exxon filed post-trial motions for judgment notwithstanding the verdict, new trial, and remittitur. On January 5, 1983, the court granted Exxon a new trial on the ground that the verdict was so excessive that the jury must have acted with passion and prejudice against Exxon. On a motion for reconsideration, the court retracted its finding of passion and prejudice and ordered remittitur of $2,108,521.31, leaving a verdict of $5,000,000.00. Alternatively, Alvey was given the option of a new trial. Exxon appeals; Alvey and Loffland cross-appeal.

## I.

■ Exxon first argues that under the holding of *Moloso v. State*, 644 P.2d 205 (Alaska 1982), any duty that it owed to Alvey had been discharged, and thus the trial court erred by not granting Exxon's motions for directed verdict and judgment notwithstanding the verdict. We held in *Moloso* that a landowner has a duty to warn employees of an independent contractor working on the premises of latent, hazardous conditions on the land. *Id.* at 219. However, either an adequate warning to the independent contractor or full knowledge of the condition by the contractor is sufficient to discharge the duty of the landowner to the employees. *Id.* at 220.

Whether or not Exxon had a duty to the plaintiff based on its status as a landowner,[5] the *Moloso* case indicates that Exxon did have a duty to Alvey based on alternative theories. In *Moloso*, the State obtained a directed verdict of non-liability for the death of two heavy equipment operators at a road construction site. We held that the State was not liable as a landowner, because either the State had adequately warned the independent contractor or the independent contractor had full knowledge of the danger. *Id.* at 220. However, the directed verdict was overturned based in part on two related legal theories—"retained control" and "assumption of duty". *Id.* at 210–14. Citing the Restatement (Second) of Torts § 414 (1965),[6] we stated:

> [I]f the employer retains the right to direct the manner of the independent

---

**3.** At this time it was dark, the seismic hole cover was flush with the ground, there was no flashing light, the area around the hole had been leveled, and, unlike the seismic hole at Point Thomson No. 1, there was no protruding casing in the hole. Pinner, an Exxon foreman, testified that he ordered a barricade erected around the conductor hole, but did not take such a precaution with the seismic hole.

**4.** Pioneer was subsequently granted summary judgment. *Alvey v. Pioneer Oilfield Services, Inc.,* 648 P.2d at 600.

**5.** Exxon does not claim that it warned either Loffland or Alvey about the seismic hole. It claims, however, that the Loffland supervisors, Henson and Spencer, were aware of the danger. We need not decide whether there was "full knowledge by the independent contractor or one supervising the work sufficient to discharge the duty of the landowner to the employees of the independent contractor," *Moloso,* 664 P.2d at 220, since we hold that Exxon had a duty to Alvey based on alternative theories.

**6.** Section 414 provides:
> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

contractor's performance, or assumes affirmative duties with respect to safety, the employer has retained sufficient control to be held liable if he exercises that control negligently.

*Moloso,* 644 P.2d at 211. *See also Parker Drilling Co. v. O'Neill,* 674 P.2d 770 (Alaska 1983).

■ In the present case, Exxon initially directed the drilling of the seismic hole. It specified where the hole should be dug. It ordered that casing be placed in the hole, that this casing be pulled out so that the hole could be enlarged, and that the casing not be reinserted. An Exxon employee designed the cover which was placed over the seismic hole. Further, an Exxon employee decided to order barricades erected around the conductor hole cover, but not the seismic hole cover. Given these actions, the trial court was correct in denying Exxon's directed verdict and JNOV motions alleging a lack of duty.

## II.

■ Exxon asserts that there was no basis in the evidence for a jury finding that Exxon was negligent and that Loffland and Alvey were not negligent. In reviewing a jury finding, a court should view the evidence in the light most favorable to the non-challenging party and ask whether there is room for a difference of opinion among reasonable persons on the point at issue. If there is, the question is for the jury and its decision should stand. *Alyeska Pipeline Service Co. v. Aurora Air Service,* 604 P.2d 1090, 1094 (Alaska 1979).

■ Clearly, a reasonable jury could have found Exxon negligent. The only protection ordered by Exxon for the seismic hole was the cover. The ground was level around the hole and there were no barricades or warning signs at the time of the accident. Further, the cover was flush to the ground and there were other similar covers lying on the ground in the area. Similarly, a reasonable jury could have concluded that Alvey was not negligent. For all appearances, the seismic hole cover was simply lying on the ground, not covering the hole, as were other covers in the area.

■ The finding of no negligence by Loffland is a closer question. However, we conclude that a reasonable jury could have found that Loffland was not negligent. John Spencer, the Loffland driller who was second in charge of the Loffland crew and who directed the removal of the conductor hole cover, testified that he "figured" that a seismic hole was present because there had been one at Point Thomson No. 1, suggesting that he was not certain he had actually seen the hole at Point Thomson No. 2 before the accident. Thus, the jury could have concluded his knowledge was based on the similarly located and adequately protected seismic hole at Point Thomson No. 1 and that he was not aware of the danger presented. James Henson, a supervisor for Loffland, testified that he saw the seismic hole at Point Thomson No. 2 when he arrived at the site a few hours before Alvey's fall. However, his testimony was that he believed the hole to be significantly smaller than it actually was based upon his knowledge of the seismic hole at Point Thomson No. 1. Further, Exxon had not indicated to him that a dangerous condition existed, he did not believe at that time that his crew members would go near the hole since it was outside Loffland's area of responsibility, and thereafter he was completely occupied with the delicate task of centering the drilling rig. While the evidence could have supported a finding of negligence on the part of Loffland by the jury, it does not justify overturning the jury verdict of no negligence by Loffland.

## III.

Exxon alleges that the trial court erred by giving a special verdict form and corresponding jury instruction that raised a negligence per se issue based on Exxon's failure to post a warning sign at the seismic hole. The special verdict form provided in part:

Issue No. 1. Was the hole as covered a dangerous condition? If your answer is

"yes", Exxon was negligent for failing to place a sign.

The jury answered this special verdict issue "yes." The court had instructed the jury as follows:

There is a law in the State of Alaska which provides the following:

If a dangerous condition is present where people can be injured an appropriately worded caution sign of yellow and black warning such person of the hazard is required.

If you find that the survey hole as covered was a dangerous condition, then Exxon's failure to place such a caution sign was negligence.

If you find that Loffland knew or should have known there was a dangerous condition and had an opportunity to place such a caution sign, then Loffland's failure to place such a sign was negligence.

The trial court based its finding that state law required the posting of warning signs for dangerous conditions on Alaska General Safety Code (GSC) § 01.1202.[7] Exxon asserts that: (1) the GSC did not apply to its operation at Point Thomson No. 2; (2) the GSC did not require a warning sign for dangerous conditions; and (3) a negligence per se instruction was otherwise improper.

We decline to decide whether the trial court properly applied principles of negligence per se since we conclude that any error was harmless. First, in answering "yes" to Issue No. 1 of the special verdict, the jury clearly concluded that the hole as covered was a dangerous condition. Second, the jury answered "yes" to both the following issues contained in the special verdict form:

Issue No. 2. Was Exxon otherwise negligent in failing to warn of a dangerous condition?

Issue No. 3. If your answer to either 1 or 2, or both, is "yes", was Exxon's negligence a proximate cause of plaintiff's injury?

Thus, the jury found: (1) that the hole as covered was a dangerous condition; (2) Exxon was negligent in failing to warn of the dangerous condition; and (3) this negligence was a proximate cause of plaintiff's injury.

■ Had Exxon alleged that it had taken measures other than posting a warning sign to warn that the hole as covered was a dangerous condition, we might conclude that the special verdict form and corresponding jury instruction could have confused the jury and hence order a new trial. However, Exxon makes no such allegations. Thus, any error was harmless.

## IV.

■ Exxon asserts that the trial court erred by refusing its negligence per se

---

7. This section provides in relevant part:
 Specifications for accident prevention signs and tags.
 (a) Scope.
 (1) These specifications apply to the design, application, and use of signs or symbols [as included in 01.1202(c) through (3) ] intended to indicate and, insofar as possible, to define specific hazards of a nature such that failure to designate them may lead to accidental injury to workers or the public, or both, or to property damage. These specifications are intended to cover all safety signs except those designed for streets, highways, railroads, and marine regulations. These specifications do not apply to plant bulletin boards or to safety posters.
 . . . .
 (c) Classification of signs according to use.
 (1) Danger signs.
 (A) Danger signs should be used only where an immediate hazard exists. There

shall be no variation in the type of design of signs posted to warn of specific dangers and radiation hazards.
 . . . .
 (2) Caution signs.
 (A) Caution signs shall be used only to warn against potential hazards or to caution against unsafe practices.
 . . . .
 (d) Sign design.
 . . . .
 (2) Danger signs.
 (A) The colors red, black and white shall be those of opaque glossy samples as specified in
 . . . .
 . . . .
 (4) Caution signs.
 (A) Standard color of the background shall be yellow; and the panel black with yellow letters. Any letters used against the yellow background shall be black.

instructions based on GSC § 01.0105(a)(1) and Alaska Construction Code § 05.-030(b)(2)(A)(i),[8] which require an employer to maintain an accident prevention program, conduct "daily inspections," and insure immediate action be taken to eliminate all hazards; and Alaska Construction Code § 05.030(c)(1),[9] which requires an employer to initiate periodic safety meetings.[10] The trial court rejected Exxon's instructions, concluding that the provisions cited by Exxon were not sufficiently specific to warrant negligence per se instructions. We do not believe the trial court abused its limited discretion [11] in refusing these instructions.

### V.

Exxon asserts that the trial court erred by denying Exxon's pre-trial motion *in limine* which sought to exclude from trial evidence that Exxon had erected barricades and flashing lights around the Point Thomson No. 2 seismic hole after Alvey's accident. Alaska Rule of Evidence 407 provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as impeachment or, if controverted, proving ownership, control, feasibility of precautionary measures, or defective condition in a products liability action.

The trial court denied Exxon's *in limine* motion, reasoning that "said evidence is relevant to show control of the area in question." We agree.

■ Exxon responded negatively to the following discovery requests which were proffered by Loffland:

24. Please *admit* that, at the time of Mr. Alvey's accident which is the subject of this litigation, and at all relevant times prior thereto, the survey hole at Point Thomson No. 2 was under the control of Exxon.

26. Please *admit* that, at all times pertinent to this litigation, the choice of types and size of cover to be used to cover the survey hole at Point Thomson No. 2 was under the control of Exxon.

Exxon contends that despite these denials,[12] it did admit that it was the leaseholder; that it undertook overall supervisory responsibility; that it ordered the seismic hole drilled; that it decided that the cover ought to be built; and that it determined

8. These provisions both state:
 Every employer shall start and maintain an accident prevention program. The program shall provide that personnel knowledgeable in the field of occupational safety and health shall make daily inspections of on the job equipment and activities. The employer shall insure that immediate action be taken to eliminate all hazards.

9. This provision states:
 The employer shall initiate and maintain periodic occupational safety and health meetings for his employees.

10. Exxon argues that its instructions were not negligence per se instructions. We disagree. The instructions would have required a finding of negligence if the jury found that Loffland had violated the applicable provisions.

11. *See Osborne v. Russell*, 669 P.2d 550, 554 (Alaska 1983); *Harned v. Dura Corp.*, 665 P.2d 5, 12 (Alaska 1983).

12. Exxon elaborated as to request 24 as follows:
 It is unclear what Loffland's discovery request No. 24 intends when it asks whether the survey hole was "under the control" of Exxon. Exxon objects to the request on the ground that it is ambiguous, if not meaningless. The location of the hole was marked by employees of Exxon and Loffland. The hole was drilled by Alaska General employees at the request of Exxon. It was covered by employees of Alaska General, with a cover built by employees of Pioneer at the suggestion of an Exxon employee, in addition to other materials. At the time of Michael Alvey's accident, the hole had been uncovered by Mr. Alvey, a Loffland employee. These facts are established by the statements and depositions in this case, of which copies are in the possession of Loffland's attorneys. These facts establish that the seismic hole was not "under the control" of Exxon during the periods requested, if indeed a hole can ever properly be said to be "under the control" of anyone.

the cover's basic structure. We conclude that given Exxon's equivocation on this crucial issue, the trial court properly ruled on the motion *in limine*.[13]

We note that Exxon did not request a cautionary instruction to the jury on this issue. The commentary to Rule 407 states that "of course, when evidence is admitted for any of these 'other purposes,' the court should instruct the jury to consider it only for the limited purpose for which it is offered, and not on the issue of negligence or culpable conduct." Both Loffland and the plaintiff did submit cautionary instructions for the jury on the limited applicability of post-accident remedial measures. However, Exxon elected not to have such an instruction given.[14]

## VI.

Exxon asserts that the jury's award of over seven million dollars in compensatory damages was so grossly excessive that it indicated passion and prejudice on the part of the jury and required negation of its finding of negligence on the part of Exxon. The trial court originally agreed with Exxon and ordered that a new trial as to all parties and all claims should be held. However, on Loffland's motion for reconsideration, the court concluded that there was not convincing evidence of passion and prejudice and that Alvey should be given the option of accepting remittitur to five million dollars or submitting to a new trial.

A court should order a new trial when the jury verdict indicates that that jury acted with passion and prejudice. *See International Brotherhood of Teamsters, Local 959 v. King*, 572 P.2d 1168, 1178–79 (Alaska 1977); *Hash v. Hogan*, 453 P.2d 468, 473 (Alaska 1969). Generally, mere excessiveness does not warrant the conclusion that the verdict was the result of emotion, prejudice, or improper motive on the part of the jurors. *Sturm, Ruger & Co. v. Day*, 615 P.2d 621, 624 n. 2 (Alaska 1980), *on rehearing* 627 P.2d 204 (1981). An excessive verdict can be corrected by remittitur. That was the objective of the trial court in this case. The grant or denial of a motion for a new trial is a matter of discretion with the trial court and will not be interfered with "except in the most exceptional circumstances and to prevent a miscarriage of justice." *International Brotherhood of Teamsters*, 572 P.2d at 1178 (quoting *National Bank of Alaska v. McHugh*, 416 P.2d 239, 244 (Alaska 1966)).

We conclude that the trial court did not abuse its discretion by denying Exxon's motion for a new trial. First, Exxon presents little evidence, other than the amount of the award, that the jury acted with passion and prejudice. Exxon seems to argue that merely the fact that it is a very large corporation proves prejudice by the jury. Exxon cites only two instances where plaintiff's counsel "took advantage of Exxon's size." In closing argument, plaintiff's counsel described Exxon as "one

---

**13.** Exxon attempts to buttress its position by citing a statement by Alvey's counsel made at the time when the evidence of subsequent remedial measures was admitted at trial. This argument is misleading. Alvey's counsel stated in response to Alaska General's objection as to relevance that "it has relevance to show the activities that took place—regarding Exxon's activities around the hole subsequent to Mr. Alvey falling into it." Exxon did not object to the evidence of subsequent remedial measures on the basis of Evidence Rule 407 at this time. The plaintiff's counsel went on to explain that he would introduce evidence later that would show that Exxon had ordered the barricades erected. The significance of this exchange is that if Exxon had not ordered the barricades put up, the evidence of subsequent remedial measures would not have shown that Exxon, as opposed to some other party, had control over safety precautions at the seismic hole.

**14.** Exxon also argues that the evidence of subsequent remedial measures should have been excluded under Evidence Rule 403, which provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Since Exxon waived its right to a cautionary instruction which would have lessened the danger of prejudice, this argument is not convincing.

big corporation, one big corporation" and "the biggest oil company in the world." Neither reference appears calculated to inflame the passions of the jury.

Second, the amount of the verdict, while large, does not seem so disproportionate to the injuries suffered by Alvey as to indicate passion and prejudice. Alvey is now a paraparetic with substantial loss of the use of his legs. He is able to walk only a limited distance "with a very labored gait" assisted with braces and other "assistive ambulatory devices." He has lost sensation in his legs and they are thus subject to skin breakdown. He is unable to evacuate his bowels and bladder spontaneously and must utilize a catheter six to eight times a day. He is prone to life threatening infection. He is not able to function normally sexually.

### VII.

 In remitting the jury verdict to five million dollars, the trial court stated, "I'm going to remit this jury verdict to a sum which in my judgment is the highest permissible sum that a reasonable jury could have awarded in this case." Exxon argues that the trial court should have awarded "what it believes to be a reasonable amount based on the evidence." In exercising review we apply our independent judgment because the question of the applicable remittitur standard, as opposed to the question of the amount of remittitur, is a question of law. *See Borkowski v. Snowden*, 665 P.2d 22 (Alaska 1983).

Exxon cites Moore's Federal Practice for the thesis that the trial court should have awarded what it believed to be a reasonable amount based on the evidence. Moore cites three alternative approaches to determine how much of a jury verdict should be remitted: (1) the "minimum possible recovery" test, under which the trial court awards the least amount that a reasonable jury could have returned; (2) an intermediate approach, under which the trial court awards the plaintiff that which the judge in his own discretion believes is reasonable; and (3) the "maximum possible recovery"

test applied by the superior court in this case. 6A J. Moore, Moore's Federal Practice ¶ 59.08[7], at 59–193 to –198 (1983). Moore concludes that the intermediate approach is the majority and better-reasoned approach, stating:

> This intermediate position gives the defendant the benefit of the full supervisory power of the trial court, and yet the plaintiff still has his option to refuse to remit. And it moderately serves the function of remittitur aimed at avoiding the judicial waste of a new trial, for the plaintiff still has a strong incentive to remit. If, on the other hand, the trial court fixes the residue at the lowest amount that it would permit a verdict to stand, this constitutes a considerable intrusion upon the jury's function and the plaintiff's incentive in remitting is reduced to a minimum. True, if the court adopts the other extreme position and orders a remittitur of only that amount which exceeds the very maximum of recovery that it would uphold, the plaintiff has a very strong incentive to accept the option of remittitur. But the defendant, who has no option, does not have the benefit of the trial court's seasoned judgment as to an amount that is ample and yet thoroughly fair. The intermediate position effects a fair and practicable adjustment.

6A Moore, *supra*, ¶ 59.08[7], at 59–197 to –198.

 In our view the "maximum possible recovery" approach is more appropriate in a remittitur context, because it comes closer to approximating the decision made by the jury. This conclusion is supported by *United States v. 1160.96 Acres of Land, Holmes Co., Mississippi*, 432 F.2d 910 (5th Cir.1970), which states:

> [T]he jury by its excessive verdict intended to award the maximum and defendant cannot complain of any judgment within the permissible limits. This theory permits reduction only to the highest amount which the jury could properly have awarded. It is the only theory

which has any reasonable claim of being consistent with the Seventh Amendment. *Id.* at 913–14 (footnotes omitted); *see also* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815, at 104–05 (1973).

▉ Exxon also argues that the trial court's award after remittitur was excessive even if the court applied the correct standard. We find no abuse of discretion. *See International Brotherhood of Teamsters,* 572 P.2d at 1178.

## VIII.

Before trial, Exxon moved that any damages awarded to Alvey against Exxon be offset by the amount of workers' compensation benefits which the plaintiff had received. The trial court denied Exxon's motion. Exxon argues the denial was erroneous because, due to the particular nature of the contract between Exxon and Loffland, it was Exxon and not Loffland who actually paid Alvey's workers' compensation benefits.

Under the Alaska Workers' Compensation Act, when an employee recovers damages from a third party, the employer is entitled to be reimbursed for workers' compensation payments paid by the employer. AS 23.30.015(g).[15] However, in *Miller v. Northside Danzi Construction Co.,* 629 P.2d 1389, 1391 (Alaska 1981), we held that a third party contractor was entitled to an offset for workers' compensation payments because the contractor had directly paid the benefits under the "contracted under" clause of AS 23.30.045(a).[16]

Exxon argues that its contract with Loffland was in effect a cost plus contract insofar as labor costs were concerned, and thus the present case is analogous to *Miller.* Exxon cites *Olivas v. United States,* 506 F.2d 1158 (9th Cir.1974), as authority for this proposition. In that case the Ninth Circuit allowed the government to offset workers' compensation benefits paid to a plaintiff even though those benefits were paid by the plaintiff's employer's insurance carrier. The court ruled that under the cost plus contract, "the risk of increased premiums was on the government." *Id.* at 1164. Exxon argues that the risk of increased premiums was on it rather than Loffland because a letter dated October 24, 1978, from Loffland to Exxon, indicates that the cost of increased workers' compensation premiums was passed on to Exxon.[17]

▉ We decline to extend our holding in *Miller* and follow *Olivas* in the present case. First, we question the correctness of *Olivas* insofar as it attempts to distinguish a cost plus contract from other contracts. While a cost plus contract relieves the contractor of the uncertainty inherent in estimating costs, the objective of any contract, from the standpoint of the subcontractor, is to pass all costs, including workers' compensation costs, on to the contractor. AS 23.30.015(g) provides that in the event of recovery from a third party, it is the employer who is to be reimbursed for amounts "paid by the employer." In *Miller,* workers' compensation benefits were not "paid by the employer," thus AS 23.30.015(g) did not apply. However, in the present case

---

**15.** AS 23.30.015(g) provides:

If the employee or his representative recovers damages from the third person, the employee or representative shall promptly pay to the employer the total amounts paid by the employer under (e)(1)(A), (B), and (C) of this section, insofar as the recovery is sufficient after deducting all litigation costs and expenses. Any excess recovery by the employee or representative shall be credited against any amount payable by the employer thereafter.

**16.** AS 23.30.045(a) provides:

An employer is liable for and shall secure the payment to employees of the compensation payable under AS 23.30.041, 23.30.050, 23.30.-095, 23.30.145, and 23.30.180–23.30.215. If the employer is a subcontractor, the contractor is liable for and shall secure the payment of the compensation to employees of the subcontractor unless the subcontractor secures the payment.

**17.** The letter explained increases in costs that were passed on to Exxon. The letter stated in part:

Much of this increase was in a workmen's compensation rate change from 6.28% to 19.05% which change is attributable to one serious accident which occurred to one of our employees while moving on to the Point Thompson No. 2 well.

Loffland paid the benefits. The fact that its costs were passed on to Exxon is irrelevant under the statute.

Second, even if we were to rely on *Olivas*, the present case is distinguishable. The court in *Olivas* held that the plaintiff's employer's insurance company had waived by contract its right, founded on a statute comparable to AS 23.30.015(g), to reimbursement of any award from the third party tortfeasor. *Olivas*, 506 F.2d at 1164–65. Thus, the court was faced with a situation where the employee would have received a double recovery if it had not allowed the third party tortfeasor-contractor an offset. *Id.* at 1165 ("If this interpretation [that the employer's insurance carrier waived its right to reimbursement] is adopted, the statutory objective of precluding double recovery by the employee will still be accomplished."). Under AS 23.30.-015, however, there is no possibility of a double recovery by the employee.

## IX.

Exxon asserts that if it is not entitled to offset the workers' compensation benefits which Alvey received, the trial court should have realigned Loffland as a party plaintiff.

Exxon relies on *Truckweld Equipment Co. v. Swenson Trucking & Excavating, Inc.*, 649 P.2d 234 (Alaska 1982). In *Truckweld* we held that where a plaintiff was suing for an amount for which it had been reimbursed by an insurer as well as for the remainder of its claim, the insurer should have been joined as a real party in interest under Civil Rule 17(a) if appropriate procedures were followed.

We conclude that our holding in *Truckweld* should not be applied in the workers' compensation context due to the specific statutory procedures set out in AS 23.30.015. Civil Rule 17(a), which sets out the standards for real parties in interest, specifically provides that "a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought." AS 23.30.015(b) provides that an employee can bring suit against a third party tortfeasor for up to one year after an award has been made, even though the employee has previously been compensated.[18] Alvey sued within one year after the award of compensation to him. He was "a party authorized by statute" to sue for the benefit in part of another under Civil Rule 17(a) and the benefited party, Loffland, was therefore not required to be joined.[19]

We note that in the usual subrogation context, the plaintiff can choose to sue for his own damages leaving the subrogee to his own lawsuit in order to recover his share. However, under section AS 23.30.-015(g) the insured worker may not sue solely for unsubrogated sums. Thus, in the ordinary case the plaintiff concerned

18. AS 23.30.015(b) provides:
 Acceptance of compensation under an award in a compensation order filed by the board operates as an assignment to the employer of all rights of the person entitled to compensation and the personal representative of a deceased employee to recover damages from the third person unless the person or representative entitled to compensation commences an action against the third person within one year after an award.

19. *See Hawkins v. United Overseas Export Lines, Inc.*, 490 F.Supp. 138 (D.Md.1980) (the assignment-subrogation scheme of the Longshoremen's and Harbor Worker's Compensation Act operates to alter the normal three-way relationship resulting from subrogation in respect to third person claims, such that the longshoreman is made the sole real party in interest for the six months in which he is authorized to sue); *Strate v. Niagara Machine and Tool Works*, 160 F.Supp. 296 (S.D.Ind.1958) (employer's insurer, which had paid injured employee pursuant to Indiana Workmen's Compensation Act, stood in shoes of employer and was not a real party in interest in an action by the employee against a third party tortfeasor); *Baltimore Transit Co. v. State*, 183 Md. 674, 39 A.2d 858 (Md.App.1944); *Herrera v. Springer Corp.*, 85 N.M. 6, 508 P.2d 1303 (App.), *rev'd on other grounds*, 85 N.M. 201, 510 P.2d 1072 (1973); *Johannsen v. Peter P. Woboril, Inc.*, 260 Wis. 341, 51 N.W.2d 53 (1952); *see also* 2A A. Larson, The Law of Workmen's Compensation § 74.41(d) (1983) (joinder of the employer or insurer may not be compelled by the third party defendant); *but see* 3A J. Moore, Moore's Federal Practice ¶ 17.-09[2–3] (1982) (advocating contrary view).

about undue confusion or prejudice caused by joinder of a subrogee can decline to sue for the subrogee's claims. This option is not available to the injured worker.

## X.

Alvey in a cross-appeal objects to the trial court's order of remittitur because he claims the trial court interjected its own opinion into its determination of the reasonableness of the general damage award, and thus violated Alvey's right to a jury trial. While Judge Souter stated that he thought the jury's award was excessive and that he thought the five million dollar award entered after remittitur was high, he specifically awarded damages based on the highest reasonable figure that a jury could have reached. We can not conclude that Judge Souter abused his discretion in his order of remittitur. *See International Brotherhood of Teamsters*, 572 P.2d at 1178.[20]

## XI.

In summary, we AFFIRM on all issues.[21]

---

**20.** Exxon argues that the plaintiff should not be entitled to assail the amount of the remitted verdict since he accepted the amount. Exxon cites 9 J. Moore, Moore's Federal Practice ¶ 203.06, at 3–28 to –30 (1983), and *Donovan v. Pen Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), as support for this proposition. In *International Brotherhood of Teamsters, Local 959 v. King*, 572 P.2d 1168, 1178 n. 35 (Alaska 1977), we affirmed a trial court's remittitur order while expressly reserving the issue of whether Alaska courts should follow *Donovan*. We elect to follow the same course here. Since the trial court's remittitur order was not an abuse of discretion, Alvey's ability to attack that order is irrelevant.

**21.** We do not reach Loffland's cross-appeal as to contractual indemnity because we affirm the decision below in which Loffland was not found liable.