John REEVES, Appellant/Cross–Appellee,

v.

ALYESKA PIPELINE SERVICE CO.,
Appellee/Cross–Appellant.

Nos. S–9168, S–9267.

Supreme Court of Alaska.

July 19, 2002.

Thomas V. Van Flein, Marcus R. Clapp, Clapp, Peterson & Stowers, LLC, Anchorage, and David H. Call, Fairbanks, for Appellant/Cross–Appellee.

David A. Devine, Groh Eggers, LLC, Anchorage, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

### OPINION

BRYNER, Justice.

## I. INTRODUCTION

John Reeves developed an idea to build a visitor center at a turnout overlooking the Trans–Alaska Pipeline near Fairbanks. He described his idea to Alyeska's Fairbanks manager, Keith Burke, in return for Burke's promise not to use the idea without allowing Reeves to participate in its implementation. Yet Alyeska subsequently ceased dealing with Reeves and proceeded to build the visitor center on its own. Reeves sued Alyeska, and a jury awarded him damages under various alternative contract and tort theories. The questions presented here center on the validity of the special verdict finding Alyeska liable for breaching its disclosure agreement with Reeves and on the measure of damages for that breach. We hold that the special verdict correctly established Alyeska's liability for breach. We also hold that the special verdict on Reeves's implied contract claim correctly determined the issue of damages. But because the superior court awarded damages on a different claim addressed in the special verdict, we remand for entry of a

modified judgment.[1]

## II. FACTS AND PROCEEDINGS

We described the salient historical facts in *Reeves v. Alyeska Pipeline Service Co. (Reeves I)*:

> In 1985 Alyeska created a visitor turnout at Mile 9 of the Steese Highway between Fox and Fairbanks. The turnout had informational signs and provided visitors a view of the Trans–Alaska Pipeline. Before Alyeska constructed the turnout, visitors gained access to the pipeline by a nearby road and trespassed on the Trans–Alaska Pipeline right-of-way.
>
> John Reeves, owner of Gold Dredge No. 8, a tourist attraction outside Fairbanks and near the turnout, contacted Alyeska in January 1991 to discuss a tourism idea he had. He spoke with Keith Burke, Alyeska's Fairbanks Manager. After receiving Burke's assurance that the tourism idea was "between us," Reeves orally disclosed his idea to build a visitor center at the turnout. He proposed that Alyeska lease him the land and he build the center, sell Alyeska merchandise, and display a "pig" and a cross-section of pipe.
>
> Burke told him the idea "look[ed] good" and asked Reeves to submit a written proposal, which Reeves did two days later. The proposal explained Reeves'[s] idea of operating a visitor center on land leased to him by Alyeska. The proposal included plans to provide small tours, display a "pig," pipe valve, and section of pipe, sell refreshments and pipeline memorabilia, and plant corn and cabbage.

After submitting the proposal, Reeves met with Burke once again. At this meeting Burke told Reeves the proposal looked good and was exactly what he wanted. In Reeves'[s] words, Burke told him, "We're going to do this deal, and I'm going to have my Anchorage lawyers draw it." Reeves claimed he and Burke envisioned that the visitor center would be operating by the 1991 summer tourist season.

Reeves alleges that Alyeska agreed during this meeting (1) to grant access to the turnout for twenty years; (2) to allow Reeves to construct and operate an information center; and (3) to allow Reeves to sell merchandise and charge a $2.00 admission fee. Reeves stated that, in exchange, he agreed to pay Alyeska ten percent of gross receipts.

Over the next several months, Burke allegedly told Reeves that the deal was "looking good" and not to worry because it takes time for a large corporation to move. However, in spring 1991, Burke told Reeves that the visitor center was such a good idea that Alyeska was going to implement it without Reeves. By August 1991 Alyeska had installed a portable building at the turnout to serve as a visitor center; it built a permanent log cabin structure in 1992.

The members of the Alyeska Pipeline Club North (APCN) operated the visitor center and sold T-shirts, hats, and other items. APCN does not charge admission. A section of pipeline and a "pig" are on display. APCN employees provide information and answer visitors' questions.

---

1. The court unanimously agrees that the jury correctly established Alyeska's liability for breaching the disclosure agreement. The court also unanimously agrees that the superior court properly declined to allow punitive damages. But we are evenly divided on the measure of compensatory damages: two justices conclude that one of the special verdict's alternative awards correctly determined compensatory damages and would therefore remand for entry of a modified judgment reflecting that award; two justices conclude that none of the special verdict's alternative theories decided the damages issue correctly.

   Our case law establishes that "[a] decision by an evenly divided court results in an affirmance." *Ward v. Lutheran Hosps. & Homes Soc'y of Am., Inc.*, 963 P.2d 1031, 1037 n. 11 (Alaska 1998) (quoting *Thoma v. Hickel*, 947 P.2d 816, 824 (Alaska 1997)). Additionally, we have recognized that "an affirmance by an evenly divided court is not precedent." *Kenai v. Burnett*, 860 P.2d 1233, 1246 (Alaska 1993) (Compton, J., concurring). In the present case, no member of the court favors outright affirmance. But two justices would affirm the jury's special verdict on both liability and an alternative theory of compensatory damages, whereas two would require a retrial on damages. In these circumstances, our case law indicates that the votes favoring the greatest degree of affirmance will determine the outcome of this case but that the decision on compensatory damages will have no precedential effect.

Members of APCN had suggested in 1987 that Alyeska create a visitor center at the turnout. However, Alyeska had rejected the idea at that time. Before meeting with Reeves, Burke did not know that APCN's visitor center idea had been raised and rejected by Alyeska in 1987.

Approximately 100,000 people visited the visitor center each summer in 1992 and 1993. It grossed over $50,000 in sales each year. The net profit for 1993 was calculated to be $5,000–$15,000. APCN received all the profit.[2]

In response to Alyeska's decision to use his idea for the visitor center without allowing him to participate in the venture, Reeves filed suit against Alyeska in May 1993.[3] He alleged breach of oral contract, promissory estoppel, breach of implied contract, quasi-contract (unjust enrichment and quantum meruit), breach of the covenant of good faith and fair dealing, breach of license or lease agreement, and various torts related to the alleged contractual relationships.[4] In pressing these claims, Reeves basically asserted two distinct theories: (1) that Alyeska had verbally given him a lease to develop the visitor center—or at least had entered into a binding contract to memorialize the terms of a lease; and (2) that, in return for disclosing his idea to Burke, Alyeska had promised not to implement or further disclose Reeves's idea without allowing him to participate in the implementation.[5]

Superior Court Judge Charles R. Pengilly granted Alyeska's motion for summary judgment on all claims as to both theories; Reeves appealed.[6] In *Reeves I*, we affirmed the summary judgment order as to all claims asserted under Reeves's first theory, holding that the statute of frauds barred enforcement of any oral lease agreement or any agree-ment to memorialize in writing the alleged contract to implement Reeves's participation in the visitor center.[7] But we reversed and remanded as to claims under Reeves's theory that Alyeska breached an alleged disclosure agreement—that is, Alyeska's alleged promise that if Reeves disclosed his idea, Alyeska would not use it without including Reeves in the venture.[8] In support of this theory on remand, Reeves asserted claims for breach of express contract, breach of implied contract, promissory estoppel, quasi-contract/unjust enrichment, and various related torts.[9]

After a two-week trial, the superior court submitted five alternative claims to the jury: (1) express contract, (2) implied-in-fact contract, (3) promissory estoppel, (4) quasi-contract/unjust enrichment, and (5) misrepresentation. Judge Pengilly gave the jury special verdict questions on each of the claims for relief. The jury returned a verdict finding on the issue of liability that

- Alyeska promised not to use Reeves's idea without allowing him to participate in its implementation;
- Alyeska broke this promise;
- Alyeska used Reeves's idea; and
- Alyeska derived actual benefit from Reeves's disclosure of his idea.

The special verdict then separately addressed Reeves's alternative claims for breach of express and implied contract, promissory estoppel, quasi-contract/unjust enrichment, and misrepresentation. The court's instructions on damages as to each of the alternative claims, and the jury's respective awards on those claims, are as follows:

- On the express contract claim, the trial court instructed the jury to base its compensatory damages award on the amount necessary to place Reeves "in

---

2. 926 P.2d 1130, 1133–34 (Alaska 1996) (footnotes omitted). Because we addressed the case on summary judgment, our decision in *Reeves I* stated the facts in the light most favorable to Reeves. *Id.* at 1133 n. 1. As used in *Reeves I* "pig" describes "a device which passes through the pipeline to clean interior pipe walls, survey interior pipe shape and detect corrosion." *Id.* at 1134 n.2.

3. *Id.* at 1134.

4. *Id.*

5. *Id.* at 1136.

6. *Id.* at 1134.

7. *Id.* at 1138–40.

8. *Id.* at 1145.

9. *Id.*

the same position that he would have been in had Alyeska kept its promise" to allow him to participate in implementing the visitor center. The jury returned an award of $2,989,000.

- As to the implied contract claim, the court asked the jury to determine damages "in the amount of the value of the idea to Alyeska." The jury returned a verdict of $1,820,000.
- On Reeves's promissory estoppel claim, the court gave an instruction similar to its implied contract instruction, directing the jury to measure damages "in the amount of the value of any benefit [Reeves] conferred upon Alyeska." The jury returned a verdict identical to its implied contract verdict: $1,820,000.
- On Reeves's quasi-contract/unjust enrichment claim, the court instructed the jury to determine "the amount of the value of the benefit which Alyeska has unjustly retained." The jury returned a verdict for $4,809,000.
- Last, the court instructed the jury on Reeves's claim for misrepresentation. The instructions required the jury to find that Alyeska had engaged in intentional misrepresentation, asking the jury to· decide, "did [Burke]· intend to break that promise at the time he made it?" The verdict form provided for both compensatory and punitive damages. To determine compensatory damages for misrepresentation, the court used a standard similar to the one it employed for Reeves's express contract claim, instructing the jury, "as nearly as possible, [to] place [Reeves] in the position he would have occupied had it not been for [Alyeska's] misrepresentation." The jury declined to award compensatory damages, finding that Reeves had failed to prove intentional misrepresentation. But the jury nevertheless awarded Reeves $7,500,000 in punitive damages.

After the jury returned these verdicts, Reeves moved for entry of judgment reflecting the compensatory awards on both his express contract claim—$2,989,000—and his unjust enrichment claim—$4,809,000—as well as the award of punitive damages for misrepresentation—$7,500,000. The superior court only awarded compensatory damages on Reeves's express contract· claim—$2,989,-000—and struck the punitive damages award.

Reeves appeals; Alyeska cross-appeals.

## III. DISCUSSION

### A. The Disclosure Agreement Was Enforceable.

■ On appeal, Reeves challenges the court's denial of punitive damages and its limited award of compensatory damages. But on cross-appeal Alyeska asserts that we need not decide these damages issues, because the disclosure agreement was unenforceable. Pointing to Reeves's admission at trial that Alyeska never promised to pay him any specified amount for disclosure of his idea—or even an unspecified reasonable value—Alyeska argues that the disclosure agreement lacked essential terms, was unenforceably vague, and so was merely an agreement to agree. But we rejected a similar argument in *Reeves I*.

■ We held there that contract and contract-like theories may protect individuals who spend their time and energy developing unoriginal or non-novel ideas that others find useful, because "[i]t would be inequitable to prevent these individuals from obtaining legally enforceable compensation from those who voluntarily choose to benefit from the services of the 'idea-person.' "[10] We further explained that "[i]f parties voluntarily choose to bargain for an individual's services in disclosing or developing a non-novel or unoriginal idea, they have the power to do so."[11] As *Reeves I* implicitly recognizes, then, a disclosure contract is not a typical agreement for the sale of goods or services at an agreed-upon price; rather, it is an agreement for disclosure of an idea in exchange for a promise not to use the idea without including the disclosing party in its implementation.

Other courts agree with this view. The Ninth Circuit Court of Appeals addressed an

---

**10.** *Id.* at 1135.

**11.** *Id.* at 1142.

analogous situation in *Landsberg v. Scrabble Crossword Game Players, Inc.*, and squarely rejected the same argument that Alyeska advances here.[12] In that case, Landsberg authored a strategy book for winning at the game of Scrabble; he then approached S & R, the makers of the Scrabble game, to obtain permission to use the Scrabble trademark in his manuscript. After negotiations regarding S & R's possible publication of the manuscript were halted, S & R published its own strategy book, which S & R based upon Landsberg's idea.[13] Landsberg sued. While finding that Landsberg's idea was not novel or original and that S & R's use of the idea in its book was not sufficiently similar to Landsberg's manuscript to establish a copyright violation, the trial court nonetheless concluded that "Landsberg's initial disclosure of his manuscript was confidential and for the limited purpose of obtaining approval for the use of the Scrabble mark, and ... given his expressed intention to exploit his manuscript commercially, defendants' use of any portion of it was conditioned on payment."[14] On review of the district court's ruling, the Ninth Circuit, applying California law, confirmed that a valid implied-in-fact disclosure contract arose in this context.[15] The court further found that a breach of the contract could be proved by evidence sufficient to establish that S & R disclosed or used Landsberg's idea without compensation.[16]

Here, as in *Landsberg,* the record contains sufficient evidence to support a finding that, in return for Reeves's agreement to disclose his idea, Alyeska promised him either confidentiality or participation in implementing the visitor center project.[17] This promise is sufficiently definite as a matter of law to establish an enforceable disclosure agreement. Similarly, there can be no question that Reeves produced sufficient evidence to support the jury's finding that Alyeska breached this agreement by unilaterally exploiting Reeves's idea. We thus reject Alyeska's assertion that the agreement's terms were too vague to establish Alyeska's liability for breach of its promise not to use Reeves's idea without including him in the venture.

**B. The Special Verdict for Breach of Implied Contract Correctly Measured Reeves's Damages.**

■ We must next determine the appropriate measure of damages for Alyeska's breach. Reeves insists that his compensatory damages should have included the jury's $4,809,000 award for unjust enrichment. Alyeska counters that a non-original idea has no intrinsic value and that *Reeves I* therefore limits Reeves's damages to "the fair market value of [his] services." But *Reeves I* touched only briefly on the proper measure of damages for breach of the disclosure agreement. Neither *Reeves I* nor other case law supports Alyeska's assertion.

Again, we find appropriate guidance in *Landsberg.* After concluding that the evidence supported the trial court's finding that S & R had formed and breached an enforceable disclosure agreement with Landsberg, the Ninth Circuit expressly rejected S & R's suggestion that compensation for breach of that contract should be limited to the fair market value of Landsberg's work; the court instead accepted Landsberg's contention that the proper measure of damages was the value of Landsberg's idea to S & R—that is, the profits that S & R (and its publishing partner, Crown Books) actually realized:

> Landsberg argues that the contract was not for the use of his manuscript, but for S & R's refraining from using it without his permission.... Landsberg was therefore entitled under the terms of the implied contract to more than the fair value of S & R's use. He was entitled to ... the profits from S & R's exploitation of [his work].[18]

---

12.  802 F.2d 1193, 1196 (9th Cir.1986).

13.  *Id.*

14.  *Id.*

15.  *Id.* at 1196–97.

16.  *Id.* at 1196.

17.  *Reeves I,* 926 P.2d at 1137.

18.  802 F.2d at 1198; *see also Donahue v. United Artists Corp.,* 2 Cal.App.3d 794, 83 Cal.Rptr. 131, 135–36 (1970) (in situation of non-novel idea, recovery need not be limited to the value of the services provided; various measures of damages, including lost profits, may properly be considered).

Because of the strong similarities between these two cases, we adopt *Landsberg's* holding as the proper measure for calculating damages here. As in *Landsberg*, the parties here reached a disclosure agreement without establishing the precise value of Reeves's proposal. But after agreeing not to use the proposal without including Reeves in its implementation, Alyeska breached its agreement and profited from its breach by unilaterally developing the visitor center.[19] Under *Landsberg*, then, the proper measure of Reeves's compensatory damages is the profit that Alyeska actually realized by exploiting Reeves's idea. We thus conclude that the trial court properly rejected Alyeska's attempt to limit Reeves's damages to the fair value of his services.

But this conclusion next requires us to consider which, if any, of the special verdict's alternative awards reflected a correct measure of Reeves's compensatory damages. The trial court entered judgment on the $2,989,000 verdict for breach of an express contract, which under the court's instructions, placed Reeves "in the same position that he would have been in had Alyeska kept its promise" to allow him to participate in implementing the visitor center. But by focusing on Reeves's potential lost revenues instead of Alyeska's actual profits, this measure of damages necessarily assumed that Reeves had the express contractual right that *Reeves I* directly precluded—the right to participate in and directly profit from the proposed venture with Alyeska, rather than merely a right to insist that Alyeska not exploit his proposal without his involvement.[20] By including lost profits that Reeves had no right to realize, then, the express contract verdict conflicted with *Reeves I*, im-

permissibly opening the door to a verdict based on the terms of a verbal lease that was legally barred and never existed.[21] Entry of judgment on this verdict was therefore improper.

■ We similarly conclude that the special verdict based on Reeves's unjust enrichment claim used an inappropriate measure of compensatory damages. In requiring the jury to determine damages "in the amount of the value of the benefit which Alyeska has unjustly retained," the unjust enrichment instruction essentially focused on the maximum potential profit that Alyeska might have realized, rather than on Alyeska's actual profits. The difference in focus is reflected in the jury's enhanced award of $4,809,000 for unjust enrichment. As already mentioned, however, the disclosure agreement only protected Reeves from unauthorized use by Alyeska; it gave him no vested right to maximized profits in the event Alyeska breached the disclosure agreement by exploiting his proposal. Moreover, as with the express contract claim, by inviting consideration of Alyeska's potential profits, this measure of damages conflicted with *Reeves I* by effectively inviting a verdict based on evidence concerning the legally barred lease agreement. In addition, because unjust enrichment is a judicially created quasi-contract remedy meant to prevent injustice where gaps in the law preclude recovery at law on a contract theory, it would be.incongruous to award a greater recovery under this theory than the jury actually awarded for breach of implied contract.[22] And finally, to award unjust enrichment damages *in addition to* breach of contract damages—as Reeves suggests we should—would, under the trial

---

19. *Reeves I,* 926 P.2d at 1133–34.

20. *Id.* at 1137–39.

21. *Id.* As already mentioned, the compensatory damages instruction on Reeves's claim for misrepresentation relied on a similar measure, asking the jury to restore Reeves to the position that he would have enjoyed had Alyeska not misrepresented its intent to exploit Reeves's proposal. Because the jury found that Reeves had failed to prove an intentional misrepresentation, however, it awarded no compensatory damages, thereby rendering this claim moot.

22. Reeves also argues that the unjust enrichment claim is separate from the express contract theory and that recovery is therefore possible under both; Reeves argues that this is so because the unjust enrichment theory applies to the lease agreement and not the disclosure agreement. But we have concluded that evidence of the lease agreement was inadmissible; the unjust enrichment claim therefore cannot survive on this argument.

court's instructions, permit Reeves to receive a double recovery.

■ We last consider Reeves's implied contract claim. Under the trial court's instructions, the special verdict on this claim reflected the profits that Alyeska actually derived from its breach of the disclosure agreement: "the amount of the value of the idea to Alyeska." The jury returned an award of $1,820,000 using this measure.[23] As we explained in *Reeves I*, "a reasonable fact-finder could determine that Burke's actions implied a promise to pay for disclosure of Reeves'[s] idea."[24] The jury found an implied contract based on the theory that Alyeska solicited disclosure by promising not to use the idea unless it first reached an agreement with Reeves that would allow him to share in the profits. The verdict thus comports with *Reeves I*. It similarly comports with *Landsberg*, which would entitle the jury to base its damages calculation on evidence of the profit or benefit that Alyeska realized from the visitor center, as opposed to the theoretical value of Reeves's services in developing and disclosing his idea or the potential but unrealized profits of either Reeves or Alyeska. Assuming that the implied contract verdict finds support in the evidence and was not the product of procedural error, then, we conclude that it relied on an appropriate measure of damages and would support a valid final judgment. Accordingly, we must next consider whether the implied contract verdict was supported by sufficient evidence or was flawed by any legal error occurring at trial.

## C. Substantial Evidence Supports the Implied Contract Verdict.

■ Alyeska insists that the trial court should have granted its motion for remittitur or a new trial because the jury's awards were excessive under any reasonable measure.[25]

■ Remittitur is only proper when a jury returns an otherwise proper verdict awarding an amount of damages that the evidence cannot reasonably support.[26] We may not use remittitur to reduce an award below the maximum possible award sustainable by the evidence,[27] and we review the denial of a judgment notwithstanding the verdict only "to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts."[28] Moreover, "[t]he grant or refusal of a motion for a new trial rests in the sound discretion of the trial court, and we will not disturb a trial court's decision on such a motion except in exceptional circumstances to prevent a miscarriage of justice."[29] We will uphold a refusal to grant a new trial "if there is an evidentiary basis for the jury's decision."[30]

Alyeska's argument thus requires us to inquire narrowly whether any record evidence, viewed favorably to Reeves, might reasonably support the jury's implied contract award.[31] We find ample evidence in the record. Reeves's tourism expert, Dr. Lorin Toepper, testified that the visitor center generates both revenue-producing activities and non-revenue-producing activities, such as improving public relations and fostering good-

23. The jury also awarded the same amount on the promissory estoppel claim. Because the implied contract and promissory estoppel awards were based on similar factual theories, were covered by identical damages instructions, and resulted in identical verdicts, we need not separately consider the estoppel verdict.

24. *Reeves I*, 926 P.2d at 1141.

25. Alyeska separately argues for remittitur on the ground that the verdict bears no relationship to the value of Reeves's services in developing and disclosing his idea. Because we have concluded that the value of those services is not the appropriate measure of damages, we need not consider this argument.

26. *Exxon Corp. v. Alvey*, 690 P.2d 733, 741–42 (Alaska 1984).

27. *Id.* at 742.

28. *Richey v. Oen*, 824 P.2d 1371, 1374 (Alaska 1992).

29. *Buoy v. ERA Helicopters, Inc.*, 771 P.2d 439, 442 (Alaska 1989).

30. *State v. Will*, 807 P.2d 467, 469 (Alaska 1991).

31. *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1061 (Alaska 1998).

will. He estimated the center's overall actual value to Alyeska as falling within the range of $2.8 to $26 million, depending on the number of visitors.

Moreover, although Reeves's other expert, economist Francis Gallela, primarily addressed a different measure of damages—Alyeska's unjust enrichment from the center between 1991 and 1998—his testimony, when viewed in the light most favorable to Reeves, provided additional corroboration to Dr. Toepper's estimate of Alyeska's profits.[32] Given this testimony, we find substantial evidence to sustain the jury's finding of $1,820,000 in damages on the implied contract claim. And finally, we note that other courts faced with the task of determining the maximum amount of damages supportable by the record in analogous contractual settings have upheld "reasonable approximation[s]" of damages, especially "where the difficulties in determining damages arise in large part from [the defendant's] own [breach]."[33]

### D. Any Evidentiary Error Did Not Affect the Implied Contract Verdict.

■ It remains to be seen whether the verdict is the product of procedural error. Over Alyeska's objection, the trial court admitted extensive evidence concerning the proposed terms of the lease agreement between Reeves and Alyeska, Reeves's plans for developing and operating the visitor center, the actual value of the center that Alyeska developed, and its potential value to both Reeves and Alyeska. Alyeska argues that this evidence should have been excluded because it was irrelevant to the matters properly at issue after our remand in *Reeves I:* the existence, terms, and breach of the disclosure agreement, as well as Reeves's resulting damages. We agree in part.

■ Under the Alaska Rules of Evidence, irrelevant evidence is inadmissible,[34] but the test of relevance is lenient: evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."[35] Even so, much of the disputed evidence seems irrelevant: under the scope of the disclosure agreement we described in *Reeves I* and under our holding today concerning the measure of damages for the agreement's breach, evidence of Reeves's personal plans for the visitor center, the proposed terms of the lease, and the center's potential but unrealized value to both Reeves and Alyeska had little or no tendency to make any fact "of consequence to the determination of the action more or less probable;" to this extent, the evidence should not have been admitted. Yet regardless of any potential to prejudice this evidence posed with respect to Reeves's other claims, it had no obvious effect on the implied contract claim: as previously noted, the trial court's instructions on this claim limited the jury's award of damages to the value that Alyeska actually realized from its exploitation of Reeves's idea, not on the idea's potential value to either Reeves or Alyeska. Because the disputed evidence had no logical bearing on the jury's determination of the existence, scope, or breach of the disclosure agreement or on the jury's determination of profits Alyeska actually realized from the disclosure agreement's breach, any error in admitting the evidence was harmless as to the implied contract claim.

### E. The Superior Court Properly Struck the Punitive Damages Verdict.

We last consider the issue of punitive damages. The jury returned a verdict for punitive damages of $7,500,000 in connection with Reeves's misrepresentation claim, despite finding that Reeves had failed to prove all necessary elements of misrepresentation. The superior court struck the award. Reeves nonetheless argues that the court erred by "striking the award in its entirety

---

**32.** By Gallela's estimate, the center earned Alyeska between $2.8 million and $4.2 million in public relations benefits (depending on whether Dr. Toepper's or Alyeska's data were used); these figures fall within Dr. Toepper's estimation of the center's actual value.

**33.** *See, e.g., Air Tech. Corp. v. Gen. Elec. Co.,* 347 Mass. 613, 199 N.E.2d 538, 548 (1964).

**34.** Alaska R. Evid. 402.

**35.** Alaska R. Evid. 401.

without the option of a remittitur or new trial." Claiming that this ruling violated his state and federal constitutional right to a trial by jury, Reeves seeks reinstatement of the verdict.

### 1. The jury verdict does not reflect a finding of negligent misrepresentation.

The trial court instructed the jury to award punitive damages only if it found all of the elements of intentional misrepresentation. Unless the jury found each element in Reeves's favor, the verdict form precluded it from awarding any form of damages—including punitive damages—on Reeves's claim of misrepresentation. The jury found that Burke did not intend to break his promise at the time that he made it; the jury thus awarded Reeves no compensatory damages for misrepresentation. Yet the jury awarded Reeves $7,500,000 in punitive damages on the same claim.

Reeves seeks to explain this seemingly inexplicable verdict by arguing that the jury made sufficient findings of negligent misrepresentation to sustain an award of punitive damages; and he further insists that punitive damages are available for an intentional breach of contract if the conduct giving rise to the breach is also a tort—even a tort based in ordinary negligence. These arguments are unpersuasive.

Although Reeves listed negligent misrepresentation as a cause of action in his second amended complaint, filed after the *Reeves I* remand to the trial court for further proceedings, the jury instructions and special verdict form omitted reference to negligent misrepresentation and focused on the elements of intentional misrepresentation. Specifically, the jury verdict form asked: "Did [Burke] intend to break that promise [not to use Reeves's idea without allowing him to partici-

pate in its implementation] at the time he made it?" The jury responded, "No." Based on this answer, the jury declined to award compensatory damages for misrepresentation, finding that Alyeska's acts did not satisfy the required elements of misrepresentation.

Reeves nonetheless argues that the jury's findings suffice to establish that Alyeska committed negligent misrepresentation. Reeves cites as support the jury foreperson's explanation, upon questioning by the trial judge concerning the basis for the punitive damages award, that the jury believed that Burke developed an intent to deceive soon after he entered into the disclosure agreement with Reeves.[36] Reeves suggests that a judgment for negligent misrepresentation should automatically be entered on a "lesser-included-tort" theory whenever a plaintiff fails to prove the necessary elements of intentional misrepresentation but establishes the elements of a negligent misrepresentation claim that was not properly submitted. But the law provides no support for this novel proposal.

Moreover, even accepting Reeves's proposal for argument's sake, his claim must fail because the jury's verdict did not amount to a finding of negligent misrepresentation. The following elements are required to establish negligent misrepresentation: (1) "the party accused of the misrepresentation must have made the statement 'in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest,' " (2) "the representation must supply 'false information,' " (3) "there must be 'justifiable reliance' on the false information supplied," and (4) "the accused party must have failed 'to exercise reasonable care or competence in obtaining or com-

---

**36.** The trial court asked the jury foreperson if the jury was aware that the award of punitive damages after answering "no" to one of the questions about misrepresentation was, at least on its face, inconsistent. The jury foreperson answered: "We felt that the only reason we answered no to that question is because it said at that time.... The assumption we had was the initial meeting with [Burke and Reeves]. And we didn't feel

that [Burke] walked into this with misrepresentation in his heart. It might have happened a second and a half later, after [Reeves] left the room, when he talked to somebody else, or thought about it or whatever, but we felt ... that Alyeska was at serious fault for the rest of it, ... all the rest of it happened after the fact, it was the misrepresentation after that."

municating the information.' " [37]

■ Although Reeves failed to object to the absence of a jury instruction on negligent misrepresentation, he did object to the element of intentional misrepresentation that focused on whether Burke's promise not to exploit Reeves's idea was false when made: "I don't see why misrepresentation ... [or] fraud would be dependent upon occurrence in time." But our case law provides a reason that applies equally to both intentional and negligent misrepresentation:

> to establish liability under [a negligent misrepresentation] theory it is not enough to demonstrate that subsequent occurrences made an originally-accurate representation ultimately false. For a representation to be actionable, both under the Alaska cases ... and under the Restatement, the representation must be false when made.[38]

Thus, for Burke's promise to be actionable as a misrepresentation—whether intentional or negligent—the promise must have been false when it was made. The instruction on intentional misrepresentation was accurate in this regard, and Reeves failed to request any instruction at all on negligent misrepresentation. Because the jury found against Reeves on his misrepresentation claim, the trial court did not err in striking the punitive damages claim.

### 2. Punitive damages may not be awarded for breach of contract involving an unproved tort.

■ Reeves also suggests that even if the jury did not find all elements of misrepresen-

tation in his favor, the evidence presented at trial supports entering judgment for punitive damages on his contract claims.[39] But we follow the Restatement's position that "[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."[40] In this case the jury failed to find for Reeves on all elements of his single tort claim, misrepresentation.

■■■ Reeves nevertheless refers to evidence presented at trial that he alleges established destruction of evidence, intentional misconduct directed at lawful operations, false testimony, and defamation. But these claims were not presented to the jury as separate tort theories that could have supported his claim for punitive damages, and it would be improper to speculate that the jury found that these torts were established, much less that they warranted an award of punitive damages. An award of punitive damages requires an express jury finding that a tort involving outrageous conduct was committed. The jury did not make such a finding here.

### 3. Denial of punitive damages did not violate Reeves's right to a jury trial.

■ Finally, Reeves argues that the trial court's failure to enter judgment on the jury's award of punitive damages violated his right to trial by jury. But this argument hinges on the incorrect assumption that the

---

**37.** *Bubbel v. Wien Air Alaska*, 682 P.2d 374, 380 (Alaska 1984) (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).

**38.** *Id.* at 381. On remand, Reeves was permitted to present only claims related to the disclosure agreement, not the alleged lease agreement or memorialization agreement. *See Reeves I*, 926 P.2d at 1145. Yet even accepting at face value the foreperson's explanation for the punitive damages award, the misrepresentations the jury relied upon for the punitive damages claim relate to the later alleged agreements, which this court had eliminated in *Reeves I*. As the foreperson stated, "[i]t might have happened a second and a half later, after [Reeves] left the room, when he talked to somebody else, or thought about it or whatever.... But we still felt that Alyeska was at serious fault for the rest of it.... And I still feel

that Alyeska was misrepresented *along the line.... I ... think it was just compounded after the fact* [of the initial moment when they sat down at that initial meeting]." (Emphasis added.)

**39.** Reeves argues that the jury's punitive damages award was not the result of passion, prejudice, or sympathy. Presumably, he raises this argument to bolster his claim that this court should reinstate the verdict entered by the jury. We need not consider this argument because, as a matter of law, punitive damages are not available.

**40.** RESTATEMENT (SECOND) OF CONTRACTS § 355 (1979); *see also Wien Air Alaska v. Bubbel*, 723 P.2d 627, 631 (Alaska 1986).

court struck a punitive damages award that was "lawfully and appropriately found by the jury." Reeves fails to recognize that the jury returned its award after misconstruing or disregarding the instructions on the special verdict form. Hence, the jury did not "lawfully" award punitive damages. The trial court thus had appropriate legal grounds to strike the award for punitive damages; it did not reweigh the evidence or otherwise interfere with the jury's verdict.

## IV. CONCLUSION

We AFFIRM the superior court's order striking punitive damages. Because the special verdict on the express contract claim incorporates an improper measure of damages and because the judgment entered by the superior court based its award of compensatory damages on the express contract verdict, we VACATE the judgment. The proper measure of damages for breach of the disclosure agreement in this case is the value of the benefit that Alyeska enjoyed as a result of its breach. The jury's alternative special verdict on the implied contract claim establishes compensatory damages under this measure, is supported by the evidence, and is not affected by any procedural error. Accordingly, we REMAND for entry of a modified judgment on the implied contract claim.

EASTAUGH, Justice, not participating.

FABE, Chief Justice, with whom MATTHEWS, Justice, joins, dissenting.

Today's decision departs significantly from our analysis in *Reeves v. Alyeska Pipeline Service Co. (Reeves I)*[1] of the remedy for breach of an implied-in-fact contract. I disagree with today's plurality opinion because I believe that the trial court erred by failing to limit the jury's consideration of damages to the value of the services Reeves provided in developing and disclosing his unoriginal idea to Alyeska. In my view, the trial court should have instructed the jury that in the absence of an express agreement regarding compensation, the jury could only consider the value of the services provided by Reeves,

not the potential commercial value of the non-novel idea. For this reason, I respectfully dissent.

In our decision in *Reeves I*, we touched on the question of the proper measure of damages for development and disclosure of an unoriginal or non-novel idea. At the trial on remand, Alyeska proposed a jury instruction that was consistent with the guidance that we provided in *Reeves I* and that would have limited damages for breach of the disclosure agreement of Reeves's unoriginal idea to the value of Reeves's services:

> [Y]ou may not compensate Mr. Reeves for the value, if any, of the idea itself: . . . . [I]f you decide that Alyeska breached the disclosure agreement by developing the pipeline viewing area by using Mr. Reeves' idea, then you should consider *how much money, if any, Mr. Reeves should be paid for his services in disclosing his idea.*

(Emphasis added.)

The trial court rejected Alyeska's proposed instruction and instead gave the jury five separate jury instructions on the measure of damages that corresponded to Reeves's various theories of recovery for breach of the disclosure contract. For breach of the express contract, the trial court instructed the jury to determine the amount necessary to place Reeves "in the same position that he would have been in had Alyeska kept its promise" to allow him to participate in implementing the visitor center. For breach of an implied-in-fact contract, the trial court instructed the jury to determine damages "in the amount of the value of the idea to Alyeska." The trial court instructed the jury to determine damages based on the promissory estoppel theory "in the amount of the value of any benefit [Reeves] conferred upon Alyeska." The unjust enrichment jury instruction directed the jury to determine damages "in the amount of the value of the benefit which Alyeska unjustly retained." On the final theory of recovery for misrepresentation, the trial court directed the jury to determine the amount of damages "that will, as nearly as possible, place [Reeves] in the

1. 926 P.2d 1130 (Alaska 1996).

position he would have occupied had it not been for [Alyeska's] misrepresentation."

We recognized in *Reeves I* that contract and contract-like theories may protect individuals who spend their time and energy developing unoriginal or non-novel ideas that may benefit others because "[i]t would be inequitable to prevent these individuals from obtaining legally enforceable compensation from those who voluntarily choose to benefit from the services of the 'idea-person.' "[2] We noted in our discussion of the implied-in-fact contract claim that when parties bargain for an individual's services in disclosing a non-novel or unoriginal idea, the services provided are like those of a writer, a doctor, or a lawyer: "each may provide a product that is not novel or original."[3] Thus, "although Reeves is not a writer, his ideas are entitled to no less protection than those of writers, doctors, or lawyers."[4]

So, in the context of our discussion of Reeves's contract theories, we intimated that, as with those of a doctor or lawyer, the value of Reeves's services in developing and disclosing an unoriginal idea would be the correct measure of damages, absent an express contract with a price term defined. We also noted in the context of our discussion of Reeves's quasi-contract claim that "[i]f Reeves' services unjustly enriched Alyeska, he should be compensated *for the value of those services*."[5]

As we explained in *Reeves I*, "[i]f parties voluntarily choose to bargain for an individual's services in disclosing or developing a non-novel or unoriginal idea, they have the power to do so."[6] If the parties reach an express agreement for monetary compensation in return for disclosure, then that agreed-upon amount would comprise the damages to be awarded upon a finding of breach of the express contract. Here, however, there was no evidence of an agreed-upon price for disclosure of Reeves's idea.

I agree with the court that the jury's finding of an implied-in-fact contract should be upheld. Reeves argued that Alyeska solicited his idea and that its manager asked him to reveal the substance of the idea. In addition, Reeves contended that Alyeska's later use of the idea created an implied contract for payment. This theory was consistent with our decision in *Reeves I* that "a reasonable fact-finder could determine that [the manager's] actions implied a promise to pay for the disclosure of Reeves' idea."[7]

But although the lack of a specific term for payment for disclosure of an unoriginal idea does not render such an agreement invalid, it does limit the damages to the value of Reeves's service in developing and disclosing the idea. And in this case, the measure of damages is the same, whether the jury used theories of implied-in-fact contract, promissory estoppel, or quasi-contract to reach its conclusion that the disclosure agreement had been breached. In proposing its instruction, Alyeska correctly recognized that where there is no contract establishing the price term for the development and disclosure of an idea, a court must base its equitable remedy on the value of the performance of one party, here Reeves, unjustly retained by the other, here Alyeska.[8]

As we suggested in *Reeves I*, if Reeves's experience or the written plan benefitted Alyeska, either in its timing or how it was presented, Reeves should be compensated for the value of his services in developing and disclosing his idea.[9] "An injured party usually seeks, through protection of either his expectation or his reliance interest, to enforce the other party's broken promise. However, he may, as an alternative, seek, through protection of his restitution interest, to prevent the unjust enrichment of the other

---

2. *Id.* at 1135 (citing 3 David Nimmer, NIMMER ON COPYWRIGHT § 16.01, at 16–3 (1994)).

3. *Reeves I*, 926 P.2d at 1142.

4. *Id.*

5. *Id.* at 1144 (emphasis added).

6. *Id.* at 1142.

7. *Id.* at 1141.

8. *Id.* at 1144.

9. *Id.*

party." [10] Moreover, "[o]ccasionally a party chooses the restitution interest even though the contract is enforceable because it will give a larger recovery than will enforcement based on either the expectation or reliance interest." [11]

As we noted in *Reeves I*, by disclosing his idea to Alyeska, Reeves substantially changed his position—he had significantly reduced his ability to bargain for the terms of the disclosure. [12] Under a theory of promissory estoppel, the court can remedy the breach of promise by enforcing that promise. [13] The amount of damages for the remedy, however, would equal the restitutionary remedy, the same remedy for unjust enrichment under a quasi-contract theory.

In summary, the appropriate measure of damages in this case, in light of the absence of express agreement establishing the amount of compensation for Reeves for the disclosure, is the fair market value of Reeves's services in disclosing the idea. Yet, the trial court directed the jury that, if it found in Reeves's favor on the implied contract claim, it should award "the amount of the value of the idea to Alyeska." The jury awarded Reeves $1,820,000 using this measure. Because the jury based its award on the revenues produced by the visitor center as well as the value of improving public relations and fostering goodwill for Alyeska, rather than evidence of the value of Reeves's services in developing and disclosing the idea, I believe that the jury's award should be vacated and the case remanded for a new trial on damages. I therefore dissent.

### Order

On consideration of the Petition for Rehearing,

**IT IS ORDERED:**

1. In *Reeves v. Alyeska Pipeline Service Co.*, this court divided evenly on the proper measure of compensatory damages for Alyeska's breach of contract, with two members of the court favoring one of the special verdict's alternative awards and two concluding that none of the verdict's theories correctly decided the issue. [1] Addressing the effect of this divided vote, our opinion concluded "that the votes favoring the greatest degree of affirmance will determine the outcome of this case but that the decision on compensatory damages will have no precedential effect." [2]

2. Alyeska has petitioned for rehearing, arguing in part that this court "overlooked the inability of an evenly divided Supreme Court to direct a trial judge to enter a new judgment." In advancing this argument, Alyeska maintains that "an evenly divided Court cannot order a trial judge to enter a new judgment that he did not previously enter."

3. Alyeska's argument misunderstands the nature of the court's ruling on this issue. Although this court was evenly split on the proper measure of damages, all members of the court agreed upon the effect of its divided vote. The court was thus unanimous in holding that the two votes favoring the greatest degree of affirmance should prevail.

4. Having considered the parties' supplemental briefing on rehearing, the court finds no reason to disturb the original ruling. At least one other state supreme court has reached the same conclusion under almost identical circumstances, [3] and Alyeska has cited no convincing authority supporting its position. Accordingly, the court unanimously denies rehearing on this point.

5. The court also unanimously denies rehearing on Alyeska's contention that the case should be reheard with a fifth justice participating.

6. Alyeska's remaining points address the opinion's ruling on the appropriate measure

---

10. Restatement (Second) of Contracts § 373 cmt. a (1981).

11. Restatement (Second) of Contracts § 344 cmt. d (1981).

12. *Reeves I*, 926 P.2d at 1142.

13. Restatement (Second) of Contracts § 90 (1981).

1. *Reeves v. Alyeska Pipeline Service Co.*, 56 P.3d 660, 663, n. 1 (Alaska, 2002).

2. *Id.*

3. See *Ringsby v. Dixon*, 496 P.2d 179 (Wyo.1972).

of damages. Rehearing on these points is denied by an evenly divided vote: Justices Bryner and Carpeneti vote to deny the petition on these points; Chief Justice Fabe and Justice Matthews dissent, voting to grant the petition.

The petition for rehearing is therefore **DENIED.**

Entered by the direction of the court.

EASTAUGH, Justice, not participating.